J-S77037-18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| DAVID M. MANILLA, | : | |
| | : | |
| Appellant | : | No. 1733 EDA 2018 |

Appeal from the PCRA Order May 18, 2018
in the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0000790-2011

BEFORE:    OTT, J., DUBOW, J. and STRASSBURGER, J.*

MEMORANDUM BY STRASSBURGER, J.:          **FILED MARCH 21, 2019**

David M. Manilla (Appellant) appeals from the order entered on May 18, 2018, which denied his second amended petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.  We affirm.

Appellant was sentenced to 10 to 25 years of incarceration after he pleaded guilty to involuntary manslaughter, two counts of persons not to possess firearm, and various hunting-related misdemeanors and summary offenses.

> The within convictions arose from the shooting death of Barry Groh on November 29, 2010, the opening day of hunting season.  He was shot with a Remington .30-06 high-powered rifle by Appellant, a convicted felon who was not permitted to possess a firearm.  The rifle had a range of almost two miles and was not legally sanctioned for hunting.  Appellant admitted that he accidentally shot [Groh].  Instead of procuring help for [] Groh, Appellant and his companions attempted to cover up Appellant's involvement.

*Retired Senior Judge assigned to the Superior Court.

*Commonwealth v. Manilla*, 53 A.3d 936 (Pa. Super. 2012) (unpublished memorandum at 1-2).

On May 24, 2011, Appellant pleaded guilty to the aforementioned charges. On July 8, 2011, after a lengthy hearing, the trial court sentenced Appellant to an aggregate term of 10 to 25 years of incarceration.[1] Appellant filed a direct appeal to this Court, and on June 21, 2012, this Court affirmed Appellant's judgment of sentence. *Manilla*, *supra*. Appellant filed a petition for allowance of appeal, which was denied by our Supreme Court on April 30, 2013. *Commonwealth v. Manilla*, 65 A.3d 413 (Pa. 2013).

On April 29, 2014, Appellant timely filed a counseled PCRA petition. On March 3, 2017, Appellant, through new counsel, filed a motion to amend his PCRA petition, which the court granted on April 12, 2017.[2] On May 31, 2017,

---

[1] Specifically, Appellant was sentenced to 2½ to 5 years of incarceration on the involuntary manslaughter conviction, 5 to 10 years on the person not to possess conviction involving the high-powered rifle used to shoot Groh, and 2½ to 10 years on the possession of a shotgun conviction, with all sentences to be served consecutively.

[2] Other than entries of appearance by Appellant's counsel, there was no docket activity in the nearly three years between the filing of Appellant's first PCRA petition and his motion to amend. Our Supreme Court has made clear that "[t]he PCRA court [has] the ability and responsibility to manage its docket and caseload and thus has an essential role in ensuring the timely resolution of PCRA matters." *Commonwealth v. Renchenski*, 52 A.3d 251, 260 (Pa. 2012).

Appellant filed a second motion to amend his petition.[3] The PCRA court held evidentiary hearings on June 8 and 19, 2017, at which Appellant testified and presented the testimony of his mother and the two attorneys who had represented him at his sentencing hearing. Thereafter, the PCRA court directed the parties to file briefs, they complied, and the PCRA court filed a memorandum opinion and order dismissing Appellant's second amended PCRA petition on May 18, 2018. Appellant timely filed a notice of appeal, and both Appellant and the PCRA court complied with Pa.R.A.P. 1925.

On appeal, Appellant presents one claim for our review: "was counsel ineffective for devising a sentencing strategy that deprived [Appellant of] an opportunity to explain certain facts that aggravated the sentence imposed." Appellant's Brief at 3. Specifically, Appellant argues that counsel was ineffective for failing to recommend to Appellant that he explain to the trial court at the sentencing hearing (1) the presence of mud in the rifle; (2) Appellant's transfer of his property to his mother within days of the shooting; and (3) Appellant's failure to contact emergency services immediately after the shooting. *Id.* at 21. Appellant further argues counsel was ineffective for failing to recommend that he "allow the court and the Commonwealth to ask him questions, rather than recommending that he allocute" at the sentencing

---

[3] At the June 8, 2017 PCRA hearing, counsel for the Commonwealth stated, and the PCRA court agreed, that the second motion to amend was granted on June 5, 2017, but no such order appears in the certified record or docket entries. N.T., 6/8/2017, at 6-7.

hearing. *Id.* He argues that but for counsel's ineffectiveness, he would have received a more lenient sentence. *Id.* at 20-28.

We review Appellant's claim according to the following. "Our standard of review of a [] court order granting or denying relief under the PCRA calls upon us to determine 'whether the determination of the PCRA court is supported by the evidence of record and is free of legal error.'" *Commonwealth v. Barndt*, 74 A.3d 185, 192 (Pa. Super. 2013) (quoting *Commonwealth v. Garcia*, 23 A.3d 1059, 1061 (Pa. Super. 2011)).

Following a review of the certified record and the briefs for the parties, we conclude that the opinion of the Honorable Brian T. McGuffin, which incorporates fully the opinion of the Honorable Albert J. Cepparulo,[4] thoroughly addresses Appellant's issue and argument and applies the correct law to facts that are supported by the record. We discern no error. Therefore, we adopt the PCRA court's opinions of September 12, 2018 and May 18, 2018, as our own, and affirm the dismissal of Appellant's second amended PCRA petition based upon the reasons stated therein.[5] *See* PCRA Court Opinion, 9/12/2018, at 7-11 (pagination supplied) (concluding that Appellant's ineffective assistance of counsel claim was without merit where it found

---

[4] After Judge Cepparulo's retirement from the court, this case was assigned to Judge McGuffin. PCRA Opinion, 9/12/2018, at 6 (pagination supplied).

[5] The parties shall attach a copy of the PCRA court's September 12, 2018 and May 18, 2018 opinions to this memorandum in the event of further proceedings.

Appellant's proffered explanations for his conduct not credible, Appellant's attorneys had a reasonable basis for their actions, and Appellant failed to demonstrate that he was prejudiced); PCRA Court Opinion, 5/18/2018, at 10-24 (explaining why it found Appellant's testimony not credible and deceptive and recognizing that Appellant had been a criminal defense attorney for 19 years; concluding that counsel acted reasonably where counsel testified credibly that if Appellant had explained his conduct at the sentencing hearing, counsel believed it would have undermined Appellant's taking responsibility for his actions, and may have impacted negatively Appellant's then-pending federal criminal charges; and concluding that Appellant had not proven he was prejudiced where there was no evidence he would have been sentenced differently but for counsel's alleged failures).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

Date: 3/21/19

**IN THE COURT OF COMMON PLEAS
BUCKS COUNTY, PENNSYLVANIA
CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA    :

                            :

v.                            :

                            :

DAVID M. MANILLA                 :

No. CP-09-CR-0000790-2011

POST-CONVICTION
RELIEF ACT

**OPINION**

## I.    INTRODUCTION

Appellant David M. Manilla ("Manilla" or "Appellant") has appealed from the Order of

May 18, 2018, entered by the Honorable Albert J. Cepparulo, denying his second amended Post

Conviction Relief Act ("PCRA") Petition, after hearings on June 8 and 9, 2017. In his PCRA

Petition, Appellant sought relief from the judgment of sentence imposed upon him by Judge

Cepparulo on July 8, 2011.

The procedural and factual background of this matter, as well as the reasoning behind the

denial of Appellant's request for PCRA relief, was thoroughly described in Judge Cepparulo's

Memorandum Opinion and Order of May 18, 2018, which is incorporated herein and attached

hereto as Appendix "A."

To briefly recap the background of this matter, Appellant shot and killed Barry Groh on

November 29, 2010, with a high powered Remington Model 760 pump action .30-06 rifle while

hunting on the first day of deer season with his uncle, Michael Marino, and another companion,

Robert Monestero, on his farm in Richland Township, Bucks County, Pennsylvania. The rifle was

equipped with a scope and was illegal for any use in Bucks County due to its range and the county's

dense population. In addition, Appellant was a convicted felon who was prohibited from owning or possessing any firearms as a result of his 1985 conviction for Aggravated Assault for striking a fellow gym patron in Norristown, Pennsylvania with a steel bar and fracturing his skull.

The investigation that followed the shooting death of Barry Groh revealed that earlier in the morning prior to shooting Mr. Groh, Appellant had had an encounter with his neighbor, Brian Schrier, and his two teenaged daughters who were legally hunting in a tree stand on their adjacent property. Appellant had approached them with his rifle pointed in their direction, and Mr. Schrier inquired why Appellant was hunting with an impermissible rifle. Appellant responded untruthfully that he was looking for a deer he had wounded earlier that morning. Appellant then left Schrier's property, but shortly afterwards turned and fired a shot in the general direction of Schrier's tree stand. Appellant's hunting companions told police that they did not see any deer when Appellant fired the shot.

Appellant, Marino and Monestero then returned to Appellant's property on an ATV. After driving through a cornfield, Appellant announced that he saw a deer and dismounted from the ATV and fired his rifle into the woods. Marino later stated that he did not see or hear a deer before or after Appellant fired his rifle. Appellant's shot struck and killed Groh, who had been standing approximately 88 yards away by a shallow stream where he had dragged a buck he had just shot and tagged. A device for pulling was attached to the buck indicating that it had been dragged there from a property on the opposite side of the stream that Appellant did not own.

When Appellant walked to the creek and discovered Groh laying there, he yelled, "man down in the creek." Appellant and his companions observed blood coming from the victim's left

side and flowing into the stream,[1] and despite two of the men having cell phones, no one called 911. Instead, they walked back to where Appellant had fired the shot and tried to locate the shell casing, which they could not find. The casing was eventually recovered by Bucks County detectives. Marino later told police that he did not call 911 because the victim was his nephew's "responsibility."

Appellant and his companions then returned to the main house of his farm where he then ran from each of the outbuildings trying to hide his rifle. He first tried to hide it in the cushions of a couch, and then asked Marino to hide it, but his uncle declined his request. Appellant eventually hid the rifle and a shotgun in his truck. Prior to hiding the guns, Appellant fired the shotgun into the ground, explaining later that he had intended to lie to the police about which gun he had been hunting with because he knew he should not have had the rifle.

At 12:39 P.M., more than an hour after shooting Barry Groh, Appellant called 911 and reported that he "found someone" on his property who had apparently been killed in a "hunting accident." Appellant transported the responding police officers and paramedic on his ATV to Groh's body. When the paramedic opined that the victim had apparently died of a heart attack, neither Appellant nor his companions advised the responding officials that he had actually been shot.

On the following day, Appellant directed two of his farm employees to remove all of his guns and ammunition from his residence in Worcester, Montgomery County, Pennsylvania, and take them to the residence of his girlfriend, Barbara Fletcher. Further investigation revealed that Appellant in fact possessed or owned approximately ninety-six (96) rifles and shotguns, many of

---

[1] It would not be until eight days later on December 7, 2010, that Monestero would admit that he saw blood in the water next to the victim and an apparent gunshot wound to the victim's left shoulder, and Marino would shortly thereafter request a follow-up interview with detectives where he made similar admissions.

which he acquired by using Fletcher as a straw purchaser. Fletcher later told detectives that Appellant had purchased guns in her name without her knowledge or permission.

On December 1, 2010, Appellant turned over to the investigating detectives the Remington Model 760 pump action .30-06 rifle which his uncle identified as the gun used by Appellant on the day of the shooting. The shell casing retrieved by the detectives from the shooting scene was determined to have been fired from the rifle, but a forensic comparison of the bullet retrieved from the victim's body with the rifle was impossible because the rifle barrel had been plugged with approximately a half inch of mud. The rifle and bullet were, however, of the same caliber and had the same rifling characteristics.

In the days following the shooting, Appellant began transferring various properties that he owned to his family members, and on December 8, 2010, Appellant sold the 1155 California Road property to PPL Electric Utilities Corporation for 1.45 Million dollars. In addition, it was revealed that Barry Groh's wife filed an emergency petition for a restraining order concerning the transfer of those properties, and Judge Mellon of this bench subsequently ordered the transfers reversed. (*See* N.T. 6/8/17, pp. 41-42.)

As noted in Judge Cepparulo's Memorandum Opinion, Appellant was subsequently charged with the following criminal counts:

> Defendant was charged with one count of *Involuntary Manslaughter* [FN 9] and three counts of *Persons Not To Possess, Use, Manufacture, Control, Sell Or Transfer Firearms* ("*Possession of a Firearm by a Former Felon*"), [FN 10] as well as one count of *Recklessly Endangering Another Person* ("*REAP*"); [FN 11] he was also charged with misdemeanor and summary hunting offenses for: (a) *Shooting At Or Causing Injury To Human Beings*, [FN 12] (b) *Traps, Firearms, Ammunition, And Other Devices*, [FN 13] (c) *Taking Possession Of Game Or Wildlife*, [FN 14] (d) *Loaded Firearm In Vehicle*, [FN 15] and (e) *Use Of Artificial Or Natural Bait*. [FN 16]

FN 9. 18 Pa.C.S. § 2504(a).
FN 10. 18 Pa.C.S. § 6105(a)(1).
FN 11. 18 Pa.C.S. § 2705.
FN 12. 34 Pa.C.S. § 2522(a).

FN 13. 34 Pa.C.S. § 2102(d).
FN 14. 34 Pa.C.S. § 2307(a).
FN 15. 34 Pa.C.S. § 3503(a).
FN 16. 34 Pa.C.S. § 2308(a)(8).

Memorandum Opinion, 5/18/18.

Appellant had waived his preliminary hearing as a result of a counseled negotiation in which the Commonwealth agreed not to pursue a charge of Third Degree Murder as long as Appellant did not seek a trial.

As also noted in Judge Cepparulo's Memorandum Opinion:

> On May 24, 2011, during a guilty plea hearing before the Honorable Albert J. Cepparulo, Judge with the Bucks County Court of Common Pleas, the Commonwealth was granted permission by the Court to *nolle prosse* count three, one of the three counts of Persons Not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms under 18 Pa.C.S. §6105(a)(1), graded as a felony of the second degree. Petitioner thereafter entered an open guilty plea to the remaining counts on the criminal information, except for count four (4), the Involuntary Manslaughter charge, to which the Petitioner entered a plea of no contest. Sentencing was deferred by request of the Petitioner to allow for a pre-sentence investigation to be completed. During the guilty plea hearing, both oral and written colloquies of the plea were accomplished. Petitioner, an attorney himself, was represented by two attorneys at the guilty plea and sentencing hearings; Keith Williams, Esquire, and J. David Farrell, Esquire.
>
> During the plea Petitioner was advised of both the guideline ranges and the maximums for the offenses to which Petitioner entered a plea of guilty, including the fact that the sentences for the individual offenses could run either concurrently or consecutively with respect to counts one (1) , two (2) and four (4). (N.T. 5/24/2011 at 7-13).
>
> During the July 8, 2011 sentencing hearing, Petitioner changed his plea on count four (4), Involuntary Manslaughter from *nolo contendere* to guilty. After a lengthy sentencing hearing where Petitioner called numerous character witnesses and offered an expert and expert reports for mitigation, Petitioner was sentenced to an aggregate sentence of ten (10) to twenty-five (25) years is a State Correctional Institution. On the Involuntary Manslaughter count, Petitioner was sentenced within the standard range of the Pennsylvania Sentencing Guidelines to not more than two and one-half (2 ½) to no more than five (5) years' incarceration. For Possessing the high-powered rifle that killed Barry Groh (count 2) Petitioner was sentenced within the standard range of the Pennsylvania Sentencing Guidelines to not less than five (5) to not more than ten (10) years in state prison. For possessing the shotgun Petitioner used in an attempt to cover-up the shooting, Petitioner was

sentenced to two and one-half (2 ½) to five (5) years in state prison, a sentence *below* the mitigated range of the sentencing guidelines.[FN 1] The Court directed that these sentences were to run consecutive to each other. The Petitioner was subject to 32 years total incarceration. The PSI requested by the Petitioner in this matter recommended a sentence of 12.5 to 25 years.

FN 1. Appellant's Sentencing Guidelines were promulgated using an Offense Gravity Score ("OGS") of ten (10) for the Persons not to Possess charges, and an OGS of six (6) for the Involuntary manslaughter charge. The Appellant's Prior Record Score ("PRS") was found to be a four (4) as a result of a 1985 conviction for Aggravated Assault, graded as a felony of the first degree. The Guideline ranges for the Persons Not to Possess charges on counts one and two were forty-eight to sixty months in the standard range, thirty-six months in the mitigated range and sixty months in the aggravated range. The Guideline ranges for count four (4), Involuntary manslaughter were twenty-seven (27) to thirty (30) months in the standard range, twenty-one (21) months in the mitigated range, and thirty (30) months in the aggravated range.

Petitioner was also ordered to pay restitution in the amount of $4,624.65 to Theresa Groh, the widow of Barry Groh, and to pay a $10,000 fine on count 6, the fine amount was also to be paid to the widow of the deceased. Additionally, the Court ordered Petitioner, as a condition of his sentence, pay the costs of prosecution, to not possess any firearms and to get a mental health evaluation and abide by its recommendations. Petitioner was provided his post-sentence rights by the Court.

Appellant's Motion for Reconsideration of Sentence was denied by Judge Cepparulo on July 27, 2011. On August 2, 2011, Appellant filed a Notice of Appeal to the Superior Court of Pennsylvania from his judgment of sentence. On June 21, 2012, the Superior Court affirmed Appellant's judgment of sentence, and the Supreme Court of Pennsylvania denied Appellant's Petition for Allowance of Appeal on April 30, 2013.

On April 29, 2014, Appellant filed a timely request for post-conviction relief. After Appellant's newly retained PCRA counsel filed motions to amend his original PCRA petition, evidentiary hearings were held on June 8 and 19, 2017. Judge Cepparulo thereafter issued his Memorandum Opinion and Order of May 18, 2018, denying Appellant's request for PCRA relief.

On June 7, 2018, Appellant filed a Notice of Appeal to the Superior Court of Pennsylvania from Judge Cepparulo's Order of May 18, 2018. As a result of Judge Cepparulo's retirement from the bench, this matter was assigned to the undersigned. On June 19, 2018, this Court issued an

order directing Appellant to file a concise statement of errors pursuant to Pa.R.A.P. Rule 1925(b). In compliance with our Order, Appellant submitted his statement of errors on July 9, 2018, which is reproduced verbatim below.

## II.    STATEMENT OF ERRORS

In his "Statement Pursuant to PA.R.App.Pro. 1925(c)," Appellant alleges the following:

1. The Court erred in failing to find that counsel was ineffective when they failed to prepare the Defendant for and help him explain negative assertions and inferences in the Pre-Sentence Report, including those arising from the presence of mud in the barrel of the weapon that killed the victim; the transfer of property to his mother, the transfer of firearms to Barbara Fletcher; his failure to contact emergency services immediately after discovering the victim's body; his use of a rifle and not a shotgun when he shot the victim; and failure to ask the defendant questions at sentencing rather than have him to allocute.

2. The Court erred in failing to find counsel ineffective for failing to submit additional character evidence in the form of letters on behalf of the Defendant.
Statement Pursuant to Pa.R/App.Pro. 1925(c).

## III.    DISCUSSION

The issues raised by Appellant in his Statement above that were not waived were thoroughly discussed in Judge Cepparulo's Memorandum Opinion that accompanied his Order of May 18, 2018, denying Appellant's request for post-conviction relief. We refer to that Memorandum Opinion for a discussion of the requirements for post-conviction relief pursuant to the PCRA, 42 Pa.C.S.A. §§ 9541-9546, and Judge Cepparulo's detailed explanations of the reasons for his Order.

As noted by Judge Cepparulo, in order to present a successful claim of ineffective assistance counsel when seeking post-conviction relief, a PCRA petitioner must demonstrate that counsel's performance was deficient and that the petitioner was prejudiced by that deficient performance. Commonwealth v. Pierce, 527 A.2d 973, 975 (Pa. 1987). If counsel's actions had some reasonable basis for effectuating the client's interests, then they are deemed constitutionally

effective and counsel's performance cannot be found to have been deficient. Id. Appellant cannot demonstrate that his counsel's performance was deficient, nor can he demonstrate, even if counsel's performance was presumed deficient, that he was prejudiced by that allegedly deficient performance.

As Judge Cepparulo further noted, Appellant's timely request for post-conviction relief is essentially based upon a general claim that his counsel was ineffective, pursuant to 42 Pa.C.S.A. § 9543(a)(2)(ii), for failing to elicit from him, at his guilty plea and sentencing hearings, various excuses that he is now offering to explain his conduct before and after killing Barry Groh. Appellant suggests that he was prejudiced by his inability to explain his actions, and if he had had the opportunity to present those excuses, he may have received a more lenient sentence.

After reviewing the record and Judge Cepparulo's credibility determinations, which were based upon the testimony of Appellant and the various witnesses throughout these proceedings, we have concluded that Appellant has essentially accused his counsel of ineffective assistance for failing to proffer even more excuses for his inexcusable criminal conduct. We do not believe that this is a legitimate basis for finding ineffective assistance of counsel.

After reviewing Appellant's testimony during the evidentiary hearings on June 8 and 19, 2017, and Judge Cepparulo's Memorandum Opinion, we did not find a shred of credibility in any of Appellant's proffered explanations for his conduct. We also noted that when Appellant's trial counsel was asked if he had discussed with Appellant prior to his sentencing "whether or not [Appellant] should explain all these illegal actions he took that day to the Court," he responded as follows:

> We talked about what he was going to say. I told him, to the best of my recollection, that I didn't think it would help him to try and explain every little thing. That if he tried to do that, he would look very defensive. It would look like

he's not really taking responsibility, but I didn't want him trying to explain every little thing to the judge. I didn't think it would be helpful.

N.T. 6/8/17, p. 87.

Appellant's counsel expressed a clear and reasonable justification for advising his client not to attempt to explain "every little thing," as that effort would be viewed as an effort to avoid accepting responsibility in this case and that such an effort would not be helpful in convincing the presiding Judge to impose a lesser Sentence. Despite Appellant's strenuous arguments to the contrary, it is clear that the advice of his counsel was not only sound but prescient. As Judge Cepparulo observed, Appellant's claim of ineffective assistance of counsel "is based upon an alleged failure to present an explanation to this Court which we determined to be deceptive, entirely incredible and designed simply to shift *blame and responsibility* away from [Appellant]." (Emphasis added.)

Accordingly, Appellant's counsel cannot be found ineffective for failing to help him present to the Court additional deceptive and incredible explanations for his conduct before and after he killed Mr. Groh.

Moreover, we reiterate Judge Cepparulo's determination that Appellant is incapable of demonstrating that he was prejudiced by his counsel's alleged ineffectiveness. Appellant claims that he was prejudiced by his inability to "explain negative assertions and inferences" that arose from his actions after the killing, including *inter alia* placing mud in the barrel of the rifle that killed the victim, the transfer of property to his mother and guns to his girlfriend, his use of a rifle instead of shotgun, and his failure to immediately contact emergency services after discovering the victim. Upon consideration of the totality of the circumstances surrounding the death of Mr. Groh, the cold and calculating nature of Appellant's actions that were clearly designed to conceal the evidence of his unethical and illegal conduct before and after he killed Mr. Groh, and the

Court's determination of Appellant's complete lack of credibility, it is extremely difficult to envision a scenario in which the Court would have been convinced to impose a lesser sentence.

Appellant's counsel were successful in negotiating a reduction in the most severe charge Appellant could have faced, given the facts and the totality of the circumstances surrounding Mr. Groh's killing, from Third degree Murder to Involuntary Manslaughter. Judge Cepparulo was obviously motivated to impose an appropriate sentencing scheme for the charges that Appellant ultimately faced that reflected the egregious and horrific nature of his conduct. It is therefore possible that, after determining that Appellant was not only untruthful in his explanations to the Court but also clearly attempting to evade responsibility for his actions, Judge Cepparulo may very well have imposed a harsher sentencing scheme.[2]

In addition, Appellant has claimed that he was prejudiced by his inability to be questioned by the Court during his allocution. As Judge Cepparulo observed, this is an amazing if not incredible allegation considering that Appellant was a licensed criminal defense attorney in the Commonwealth of Pennsylvania for nineteen (19) years who should have known that no such right to examination during allocution exists. In fact the very point of allocution is to allow a Defendant to offer a statement and not be subjected to examination. Furthermore, given the Court's determination that he lacked credibility, Appellant may very well have jeopardized his guilty plea if he had exposed himself to such examination. Appellant reviewed his allocution with his attorneys, who were concerned with possible pending Federal charges stemming from this incident, and accordingly advised him to allocute. Appellant cannot demonstrate actual prejudice

---

[2] For example, Judge Cepparulo found Appellant's explanation that he fired the shot from the shotgun, not to deceive the police as he originally admitted but because he had actually intended to commit suicide, to be completely self-serving and devoid of any credibility. That claim was undermined by all of Appellant's other actions he undertook following his killing of Mr. Groh, including his attempts to retrieve the spent shell casing, hide the rifle and his other weapons, transfer the weapons to his girlfriend's house and transfer his properties to his mother. Those do not appear to be the actions of someone contemplating suicide.

from his alleged inability to be examined during his allocution, and there is simply no merit to his allegation.

Finally, Appellant has alleged that his counsel was ineffective for failing to submit additional character evidence in the form of letters on behalf of him. This issue was addressed by Judge Cepparulo in his Memorandum Opinion of May 18, 2018. We further note that Appellant has failed to prove or even demonstrate how additional character reference letters, which would presumably essentially state the same thing, would have mitigated his sentence. We therefore find no merit to this issue.

IV. CONCLUSION

Appellant has appealed from the Order of May 18, 2018, denying his request for post-conviction relief seeking modification of the sentences imposed after his guilty plea to charges that resulted from his shooting to death of Barry Groh on November 29, 2010. Following the rejection of his direct appeal, Appellant has now alleged through the PCRA claims of ineffective assistance of counsel for failing to help him explain to the Court the actions he took after he shot Mr. Groh to death. We have determined that counsel cannot be found ineffective for failing to assist Appellant in presenting additional excuses for his inexcusable criminal conduct to the Court, excuses that have been determined to be incredible and non-meaningful. Furthermore, we have determined that Appellant has failed to demonstrate that he was actually prejudiced by that alleged ineffective assistance of counsel. We therefore find no merit to Appellant's issues, and respectfully suggest that Appellant's appeal be denied and dismissed.

9-10-18

BY THE COURT:

BRIAN T. McGUFFIN, J.

**Copies Sent To:**

Stuart Wilder, Esq.
124 East Court Street, 2nd Floor
Doylestown, PA 18901-4321

Attorney for Petitioner, DAVID M. MANILLA

Robert D. James, Esq.
Deputy District Attorney
Bucks County Justice Center
100 N. Main St.
Doylestown, PA 18901

Attorney for the Commonwealth

# APPENDIX "A"

*See Attached*
*S. Wilder*
*R. James* 5/18/18

# IN THE COURT OF COMMON PLEAS
## BUCKS COUNTY, PENNSYLVANIA
### CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA  :  No. CP-09-CR-0000790-2011

v.  :  POST-CONVICTION
                                 RELIEF ACT

DAVID M. MANILLA  :

---

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

Petitioner/Defendant David M. Manilla ("Manilla" or "Petitioner") has filed a Post Conviction Relief Act ("PCRA") Petition seeking relief from his judgment of sentence imposed in this matter on July 8, 2011. For the reasons that follow, we deny his Petition.

### II.  FACTUAL BACKGROUND

The factual background underlying this matter was previously described in this Court's Opinion of November 3, 2011, from which we have reproduced the following excerpt:

> This case arises from the death of Barry Groh ("Groh"), a fifty-two (52) year old married father of two, who was killed by a single bullet to the heart moments after bagging a nine-point buck on November 29, 2010, the opening day of hunting season. Defendant would later confess that he accidentally shot Groh. By law, Defendant should not have been aiming a gun at anything; Defendant, who had been a well-known criminal defense attorney in Montgomery County, Pennsylvania, had been convicted of aggravated assault as a felony in 1985 and was prohibited from owning or possessing any firearms. [FN 1]

FN 1. On May 24, 2011, Defendant pled nolo contendere to *Involuntary Manslaughter* (which he later amended to a guilty plea) and pled guilty to multiple other charges as set forth below. For ease of reference, the Notes of Testimony from Defendant's plea colloquy conducted on May 24, 2011 shall be referenced as "N.T. Plea Hr'g."

N.B. It is your responsibility to notify all interested parties of the above action.

At approximately 5:30 A.M. on November 29, 2010, Defendant arrived at his farmland property located at 1155 California Road, Richland Township, Bucks County, Pennsylvania to hunt deer with his uncle, Michael Marino ("Marino"), and their friend, fellow attorney Robert Monestero ("Monestero"). (N.T. Plea Hr'g 18-19.) [FN2] The 1155 California Road property is improved by a house and related outbuildings, is approximately eighty-eight (88) acres, and contains a cornfield and a wooded area with a stream where Groh's body was found. (See id.; Exh. C-10.) In preparation for the hunt, Defendant had directed the caretaker of the property to set corn baits to attract deer. (N.T. Plea Hr'g 61.)

FN 2. Defendant owns five other properties in Montgomery County, including 2060 Valley Forge Road, Worcester, Montgomery County, Pennsylvania where he resided.

While waiting for Marino and Monestero to arrive, Defendant hunted alone but did not discharge his shotgun. (N.T. Plea Hr'g 18.) Although he had been convicted of aggravated assault in 1985 [FN3] and, by law, was prohibited from possessing any firearms, Defendant was hunting with a validly-issued hunting license. (Id.)

FN 3. The facts underlying Defendant's aggravated assault conviction are as follows:

> On February 22, 1985, Defendant was at a gym in Norristown, Pennsylvania when he told a fellow gym patron that if Darryl Childs (the victim in that case) had a "problem with him, he would kill the asshole." (N.T. Plea Hr'g 63.) When he later confronted Childs in the parking lot of the gym, Defendant struck Childs in the head and torso with a steel bar, fracturing his skull. (Id.) Childs subsequently required surgery to remove a portion of his skull. (Id.) Following his aggravated assault conviction, Defendant was sentenced to not less than four (4), nor more than twenty-three (23) months' incarceration in a county correctional facility. (Id.)

Meanwhile, Groh was also hunting at approximately 10:15 A.M. on a property adjacent to Defendant's. (Id.) At 10:28 A.M., Groh, who had just shot and tagged a buck, called his wife, Theresa Groh, to ask her to have their younger son, Justin, put on "full orange," bring his license, and come join him. (N.T. Plea Hr'g 19; N.T. Sentencing 20.) [FN4]

FN 4. For ease of reference, the Notes of Testimony from Defendant's sentencing on July 8, 2011 shall be referred to as "N.T. Sentencing."

At 10:30 A.M., Defendant's hunting partners arrived and the three men completed the first drive of their hunt in an all-terrain vehicle (ATV). (N.T. Plea Hr'g 20.) Defendant then exchanged his shotgun for a scoped Remington 760 pump action rifle loaded with .30-06 Springfield cartridges. (N.T. Plea Hr'g 19-20.) Although Defendant was not permitted to possess any firearms due to his prior conviction, the shotgun was legally permitted for deer hunting in Bucks County. (See N.T. Plea Hr'g 19-21.) The Remington pump action rifle, by contrast, was illegal for any use in Bucks County, due to the county's dense population and the rifle's potential range of 1.99 miles. (See N.T. Plea Hr'g 60.)

At 11:00 A.M., Defendant and his party encountered Brian Schrier ("Schrier") and his two teenaged daughters who resided on a property adjacent to Defendant's. Schrier and his daughters were hunting lawfully from a tree stand erected on Schrier's property but near the boundary line he shared with Defendant. (N.T. Plea Hr'g 20.) Defendant walked towards Schrier and his daughters with his rifle pointed in their direction. (Id.) Schrier asked Defendant to aim his rifle in a safe direction and, recognizing the high-powered rifle as illegal, asked Defendant why he was armed with the rifle. (N.T. Plea Hr'g 20-21.) Defendant replied that he was hunting with two friends and that he carried the rifle because he was looking for a buck he had shot earlier that morning. (N.T. Plea Hr'g 21.) Defendant departed from Schrier's property, but shortly thereafter fired a shot in the general direction of Schrier's tree stand. (Id.) Monestero later told police that he did not see any deer when Defendant fired this first shot, and it was later determined that Defendant had inexplicably directed this shot towards Schrier's tree stand. (Id.; Exh. C-10.) [FN 5]

FN 5. Bucks County detectives later determined that this first shot traveled approximately twenty (20) to thirty (30) degrees to the left of Schrier's tree stand. (N.T. Plea Hr'g 22.)

Defendant, Marino, and Monestero then returned to the ATV on the 1155 California Road property, and Defendant drove them through a cornfield. (N.T. Plea Hr'g 23.) Announcing that he saw a deer across the stream, Defendant stopped the ATV. (Id.) He dismounted and, using the high-powered rifle, almost immediately fired a shot into the woods at the south end of his property. (Id.) Marino later stated that he did not see or hear a deer before or after Defendant fired the shot. (Id.)

This shot struck and killed Groh, who was standing approximately eighty-eight (88) yards away on the bank of the shallow stream where he had dragged his buck. (See Exh. C-14; N.T. Plea Hr'g 24, 42, 59-61.) The investigation by Bucks County detectives using a sophisticated Nikon laser would later reveal that no person could have seen Groh's deer from Defendant's vantage point. (N.T. Plea Hr'g 47-48.) Detectives also concluded, however, that it was impossible to determine whether Defendant could have seen Groh. (Id.) Defendant later told police that he used the rifle's sight rather than its scope. (Id.)

After firing the shot, Defendant walked to the creek alone while Marino and Monestero waited by the ATV. (N.T. Plea Hr'g 25.) When Defendant yelled "man down in the creek," they followed Defendant and saw Groh's body. (Id.) Groh's feet were laying on the creek bed, and most of his legs and torso were in the water. (N.T. Plea Hr'g 28.) Groh's orange vest lay on the bushes growing on the creek bank and his orange hat lay on the right side of his body on the ground. (N.T. Plea Hr'g 25, 36; Exh. C-12.) Groh's son, Justin, would later explain that Groh never took his hat off in the field during a hunt. (N.T. Plea Hr'g 36.)

All three men observed blood coming from the left side of the victim's body and flowing into the water. (See N.T. Plea Hr'g 52, 53.) The bullet had entered

Groh's left shoulder where it shattered his humerus and created a four-inch gaping exit wound in the inner left arm before entering his chest cavity where it pierced Groh's heart, both of his lungs, and his liver and fractured two ribs, before exiting his chest and passing through his right arm. (Exh. C-14; N.T. Plea Hr'g 41.) The autopsy report revealed that a liter of blood had filled each lung and concluded that Groh had bled to death in less than one minute. (Id.; Exh. C-14.)

Despite at least two of the men having cell phones with them, no one called 911. (N.T. Plea Hr'g 26.) Rather, Defendant asked Marino, "Uncle Mike, did I shoot that guy?" (Id.) Marino later advised police that he did not call 911 because Groh was Defendant's responsibility. (N.T. Plea Hr'g 26, 46.)

After leaving Groh's body in the creek, the three men returned to the area where Defendant had fired the shot to search for the shell casing that had been ejected from the rifle. (N.T. Plea Hr'g 29-30.) They were, however, unable to find the shell casing, (id.), which was eventually recovered by Bucks County detectives, (N.T. Plea Hr'g 46).

Upon returning to the main house of the 1155 California Road property, Defendant ran from outbuilding to outbuilding attempting to hide the rifle. (N.T. Plea Hr'g 30.) First, Defendant attempted to hide the rifle beneath the cushions of a couch. (Id.) Defendant then asked Marino to hide the rifle for him, but Marino refused. (Id.) Ultimately, Defendant hid his rifle, as well as his shotgun, in his truck. (Id.) Prior to hiding both guns, however, Defendant fired a round from the twelve-gauge shotgun into the ground behind the house. (Id.) [FN 6] Defendant explained later that he fired the round from the shotgun and hid the guns in order to lie to the police about which gun he was using to hunt because "he shouldn't have had [the rifle]." (Id.)

FN 6. In the investigation following Groh's death, detectives observed one of Defendant's employees digging in the area where Defendant had fired into the ground. (N.T. Plea Hr'g 32.) This employee, however, denied that he was searching for the discharged shotgun slug. (Id.)

At 12:39 P.M., Defendant called 911 to report that he "found someone" on his property who appeared to have been killed during a "hunting accident," *verbatim*, as follows:

Operator: 911, where is the emergency?
Manilla: Hi, uh, we are in Richland Township, California Road.
Operator: Okay, a hundred block or intersection?
Manilla: Ahh, 1155 California Road.
Operator: Okay, and what is the phone number you are calling from?
Manilla: Ah, I don't know, it's a cell phone number.
Operator: Okay, what's your name please?
Manilla: My name's David . . .

Operator: Last name?

Manilla: Manilla.

Operator: And what's the problem there?

Manilla: We found someone de . . . ah, in the water with a hunting accident.

Operator: Okay, are they awake and responding to you right now?

Manilla: No, they look like they've already passed.

Operator: Okay. How far into the water are they do you know?

Manilla: Ah, I don't know, I really can't tell you, Umm, (sic) we walked over to him, I'm wet now.

Operator: Okay, I mean are his feet in the water or . . .

Manilla: No, no, no.

(Exh. C-13.) Defendant transported the responding Richland Township police officers and paramedic to Groh's body with his ATV. (N.T. Plea Hr'g 34.) Upon preliminary review of Groh's body, the paramedic advised the officers that Groh appeared to have died of a heart attack. (Id.) Neither Defendant nor his two companions corrected the paramedic by explaining that they had observed Groh's blood in the water or that Defendant had fired a shot in the direction of Groh minutes before finding his body. (N.T. Plea Hr'g 34-35.) It would be eight (8) days before a member of the hunting party, specifically Monestero, admitted that he had seen Groh's blood and also observed a gunshot wound. (N.T. Plea Hr'g 52.) A large buck was found several feet away from Groh's body; both a tag and a device for pulling the animal were attached to the buck, indicating it had been pulled to that location from a property on the opposite side of the creek (which was not owned by Defendant). (N.T. Plea Hr'g 35.) [FN 7]

FN 7. Defendants and his hunting partners would leave the scene after providing the officers with their contact information, but before the officers advised them that they were clear to leave the scene. (N.T. Plea Hr'g 36.) After Defendant's departure and the arrival of the coroner, Groh's son, Justin, would arrive on scene and need to be led away by officers. (N.T. Plea Hr'g 37.)

The next day, Defendant directed two of his farm employees to remove all of his guns from his residence in Worcester, Montgomery County, Pennsylvania and take them to the house owned by his girlfriend, Barbara Fletcher ("Fletcher"). (N.T. Plea Hr'g 38.) One employee testified before the grand jury that it took several trips to move all the guns. (Id.) Also at Defendant's direction, the employees transported a large duffle bag of ammunition to Fletcher's house. (N.T. Plea Hr'g 39.)

During the course of the investigation, Fletcher advised Bucks County detectives that she was shocked to hear that Defendant was a convicted felon not permitted to possess any firearms because she had hunted and shot with him over the past several years, often with other lawyers or members of law enforcement. (N.T. Plea Hr'g 39.) Fletcher later provided detectives with access to the guns that Defendant's employees had delivered to her residence. (N.T. Plea Hr'g 54.) The

detectives inventoried eighty-six (86) rifles and shotguns, eighteen (18) of which Fletcher did not recognize as hers. (Id.) The detectives would also later find an additional ten (10) firearms, all of which were rifles or shotguns, in Defendant's Worcester residence. (N.T. Plea Hr'g 57-58.)

On December 1, 2010, Defendant turned over a Remington model 760 pump action .30-06 rifle with a Redfield three-by-nine scope, which was identified by Marino as the gun used by Defendant on November 29, 2010. (N.T. Plea Hr'g 42.) A forensic comparison of the bullet retrieved from Groh's body to the .30-06 rifle used by Defendant was impossible, however, because the bore of the rifle had been plugged with approximately a half inch of mud. (Id.; Exh. C-8.) [FN8] Analysis of Defendant's rifle and the recovered bullet, however, revealed that both were of the same caliber and had the same general rifling characteristics. (N.T. Plea Hr'g 59.) The spent shell casing recovered from the crime scene, moreover, was determined to have been fired from Defendant's .30-06 rifle and was consistent with the caliber of bullet recovered from Groh's body. (N.T. Plea Hr'g 59-60.)

FN 8. In addition to the mud plugged into the bore of the rifle, the scope and the rear fixed sights of the rifle were damaged, and there was mud on the rear butt stock. (N.T. Plea Hr'g 42-43.) The exterior of the barrel, however, was otherwise clean and undamaged (Id.; see Exh. C-8.)

Defendant was charged with one count of *Involuntary Manslaughter* [FN9] and three counts of *Persons Not To Possess, Use, Manufacture, Control, Sell Or Transfer Firearms* ("*Possession of a Firearm by a Former Felon*"), [FN10] as well as one count of *Recklessly Endangering Another Person* ("*REAP*"); [FN11] he was also charged with misdemeanor and summary hunting offenses for: (a) *Shooting At Or Causing Injury To Human Beings,* [FN12] (b) *Traps, Firearms, Ammunition, And Other Devices,* [FN13] (c) *Taking Possession Of Game Or Wildlife,* [FN14] (d) *Loaded Firearm In Vehicle,* [FN15] and (e) *Use Of Artificial Or Natural Bait.* [FN16]

FN 9. 18 Pa.C.S. § 2504(a).
FN 10. 18 Pa.C.S. § 6105(a)(1).
FN 11. 18 Pa.C.S. § 2705.
FN 12. 34 Pa.C.S. § 2522(a).
FN 13. 34 Pa.C.S. § 2102(d).
FN 14. 34 Pa.C.S. § 2307(a).
FN 15. 34 Pa.C.S. § 3503(a).
FN 16. 34 Pa.C.S. § 2308(a)(8)

Opinion, 11/3/11, pp. 1-8.

## III. PROCEDURAL BACKGROUND

The procedural background of this matter was accurately and thoroughly explained in the

"Respondent's Post-Conviction Relief Act Reply Brief" filed by the Commonwealth on November

13, 2017, which we have reproduced in relevant part below:

On January 31, 2011, before the Honorable Magisterial District Justice Robert C. Roth at Magisterial District Court 07-2-05, the Petitioner waived his preliminary hearing, forwarding all of the above charges up to the Bucks County Court of Common Pleas.

On March 3, 2011 a Criminal Information on Criminal Court Docket number 0790 of 2011 was filed charging Petitioner with the above listed criminal and hunting violations. Petitioner waived his presence at the formal arraignment for March 4, 2011.

On April 12, 2011, an order was signed permitting defense ballistics expert to examine "any and all relevant ballistic evidence" related to the case against the Petitioner.

On April 14, 2011 the Commonwealth filed an Omnibus Pre-Trial Motion with the Bucks County Court of Common Pleas.

On May 24, 2011, during a guilty plea hearing before the Honorable Albert J. Cepparulo, Judge with the Bucks County Court of Common Pleas, the Commonwealth was granted permission by the Court to *nolle prosse* count three, one of the three counts of Persons Not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms under 18 Pa.C.S. §6105(a)(1), graded as a felony of the second degree. Petitioner thereafter entered an open guilty plea to the remaining counts on the criminal information, except for count four (4), the Involuntary Manslaughter charge, to which the Petitioner entered a plea of no contest. Sentencing was deferred by request of the Petitioner to allow for a pre-sentence investigation to be completed. During the guilty plea hearing, both oral and written colloquies of the plea were accomplished. Petitioner, an attorney himself, was represented by two attorneys at the guilty plea and sentencing hearings; Keith Williams, Esquire, and J. David Farrell, Esquire.

During the plea Petitioner was advised of both the guideline ranges and the maximums for the offenses to which Petitioner entered a plea of guilty, including the fact that the sentences for the individual offenses could run either concurrently or consecutively with respect to counts one (1) , two (2) and four (4). (N.T. 5/24/2011 at 7-13).

During the July 8, 2011 sentencing hearing, Petitioner changed his plea on count four (4), Involuntary Manslaughter from *nolo contendere* to guilty. After a lengthy sentencing hearing where Petitioner called numerous character witnesses and offered an expert and expert reports for mitigation, Petitioner was sentenced to an aggregate sentence of ten (10) to twenty-five (25) years is a State Correctional Institution. On the Involuntary Manslaughter count, Petitioner was sentenced within the standard range of the Pennsylvania Sentencing Guidelines to not more

than two and one-half (2 ½) to no more than five (5) years' incarceration. For Possessing the high-powered rifle that killed Barry Groh (count 2) Petitioner was sentenced within the standard range of the Pennsylvania Sentencing Guidelines to not less than five (5) to not more than ten (10) years in state prison. For possessing the shotgun Petitioner used in an attempt to cover-up the shooting, Petitioner was sentenced to two and one-half (2 ½) to five (5) years in state prison, a sentence *below* the mitigated range of the sentencing guidelines.[FN 1] The Court directed that these sentences were to run consecutive to each other. The Petitioner was subject to 32 years total incarceration. The PSI requested by the Petitioner in this matter recommended a sentence of 12.5 to 25 years.

FN 1. Appellant's Sentencing Guidelines were promulgated using an Offense Gravity Score ("OGS") of ten (10) for the Persons not to Possess charges, and an OGS of six (6) for the Involuntary manslaughter charge. The Appellant's Prior Record Score ("PRS") was found to be a four (4) as a result of a 1985 conviction for Aggravated Assault, graded as a felony of the first degree. The Guideline ranges for the Persons Not to Possess charges on counts one and two were forty-eight to sixty months in the standard range, thirty-six months in the mitigated range and sixty months in the aggravated range. The Guideline ranges for count four (4), Involuntary manslaughter were twenty-seven (27) to thirty (30) months in the standard range, twenty-one (21) months in the mitigated range, and thirty (30) months in the aggravated range.

Petitioner was also ordered to pay restitution in the amount of $4,624.65 to Theresa Groh, the widow of Barry Groh, and to pay a $10,000 fine on count 6, the fine amount was also to be paid to the widow of the deceased. Additionally, the Court ordered Petitioner, as a condition of his sentence, pay the costs of prosecution, to not possess any firearms and to get a mental health evaluation and abide by its recommendations. Petitioner was provided his post-sentence rights by the Court.

On July 15, 2011 a timely *Motion for Reconsideration of Sentence* was filed by Petitioner's trial counsel and forwarded to the Court for consideration.

On July 18, 2011, the Commonwealth filed an Answer to Petitioner's *Motion to Reconsider Sentence*. Petitioner sought a reconsidered sentence, averring that "under current standards applied to the parole of state prisoners by the Pennsylvania Board of Probation and Parole the Defendant will be required to serve sixty (60%) percent or more of his maximum sentence which would be fifteen years," and "Defendant has serious health problems which could very possibly lead to his death prior to his parole in this matter." [FN 2]

FN 2. In the Commonwealth's Answer, the Commonwealth verified that the Pennsylvania Board of Probation and Parole does not have a board standard which dictates the necessary amount of time an inmate must serve above their minimum sentence. Leo Dunn, the Assistant to the Executive Director of the Board indicated that over 56% of all state prisoners are being paroled at their minimum sentence.

On July 27, 2011, Judge Albert J. Cepparulo denied Petitioner's *Motion to Reconsider Sentence*.

On August 2, 2011, Petitioner filed a timely Notice of Appeal to the Pennsylvania Superior Court from the sentence imposed on July 8, 2011 and the July 27, 2011 denial of the *Motion to Reconsider Sentence*.

On August 19, 2011 a *Concise Statement of Matters Complained on Appeal* was filed by Appellate counsel Norris E. Gelman.

On November 3, 2011 an Opinion for this matter was filed by the Honorable Court of Common Pleas judge Albert J. Cepparulo.

On November 4, 2011 a complete record of this matter from the Bucks County Court of Common Pleas was sent to the Superior Court of Pennsylvania.

On June 21, 2012 the Superior Court Affirmed the Judgment of Sentence and the Defendant's subsequent Petition for Allowance of Appeal was thereafter denied by the Pennsylvania Supreme Court on April 30, 2013.

On April 29, 2014 Petitioner filed for relief under the Post-Conviction Relief Act. Initial Petition filed on behalf of Petitioner by Attorney Joseph Hylan.

On April 21, 2017 Petitioner's Motion to Amend PCRA Petition [was] filed by new PCRA counsel Stuart Wilder, Esquire.

On May 31, 2017 Petitioner's Second Motion to Amend PCRA Petition was filed by counsel.

Evidentiary Hearings were held on June 8 and June 19, 2017.

Prior to the June 8th evidentiary hearing, counsel for the Petitioner withdrew all prior claims made by Petitioner in his initial counseled PCRA petition.

Respondent's Post-Conviction Relief Act Reply Brief, 11/13/17.


## IV.  ISSUES RAISED BY PETITIONER

Pursuant to the "Second Motion to Amend Defendant's PCRA Petition" filed on May 31, 2017, Petitioner has raised, as grounds for relief at the PCRA hearings held on June 8 and 19, 2017, the following claims of ineffective Assistance of Counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Art I, §9 of the Pennsylvania Constitution:

1. Failure to challenge the Defendant's sentence on the ground that the Court illegally took into account his prior decision to plead not guilty and go to trial for a prior game law violation, thereby punishing him for exercising his right to go to trial in that matter;

2. Failure to recommend and help Petitioner challenge at sentencing the implications the Court could draw from the presence of dirt in one of the firearms by having him explain he was not responsible for the condition of the firearm;

3. Failure to recommend and help Petitioner explain the transfer of his property to his mother, which was not done at his instigation or with his participation;

4. Failure to recommend and help Petitioner explain his failure to contact emergency services immediately after the shooting, as an explanation was available to explain why and how these events occurred and why the Court drew the wrong implications from them when sentencing the Petitioner;

5. Failure to allow the Court and the Commonwealth to ask him questions, rather than recommending that he allocute so he could answer the allegations the Court and the Commonwealth raised that he continued to conceal evidence of the shooting and otherwise did not act in a responsible and remorseful way; and

6. Failure to seek letters of reference to present to the Court at sentencing to mitigate the sentence.

Second Motion to Amend Defendant's PCRA Petition, 5/31/17.

## V.    DISCUSSION

Petitioner's timely request for post-conviction relief is essentially based upon a general claim that his counsel was ineffective, pursuant to 42 Pa.C.S.A. § 9543(a)(2)(ii), for failing to elicit from Petitioner, at his guilty plea and sentencing hearings, various excuses that he now offers to the Court to explain his conduct before and after his killing of the victim, Barry Groh. Petitioner suggests that he was prejudiced by his inability to explain his actions and that if he had had the opportunity to provide those excuses, this Court would have been more lenient in the imposition of the sentences he received.

> To prevail on a petition for PCRA relief, a petitioner must plead and prove by a preponderance of the evidence that his or her conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2). These

circumstances include a violation of the Pennsylvania or United States Constitution or ineffectiveness of counsel, either of which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(i) and (ii). In addition, a petitioner must show that the claims of error have not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(3). An issue has been waived "if the petitioner could have raised it but failed to do so before trial, at trial, on appeal or in a prior state post[-]conviction proceeding." 42 Pa.C.S. § 9544(b). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2).

Commonwealth v. Spotz, 18 A.3d 244, 259 (Pa. 2011).

To prevail in a claim of ineffective assistance of counsel, a petitioner must overcome the presumption that counsel is effective by establishing all of the following three elements, as set forth in Commonwealth v. Pierce, 527 A.2d 973, 975–76 (Pa. 1987): (1) the underlying legal claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice because of counsel's ineffectiveness. Commonwealth v. Dennis, 950 A.2d 945, 954 (Pa. 2008). With regard to the second, reasonable basis prong, "we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis." [Commonwealth v. Washington, 927 A.2d 586, 594]. We will conclude that counsel's chosen strategy lacked a reasonable basis only if Appellant proves that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued." Commonwealth v. Williams, 899 A.2d 1060, 1064 (Pa. 2006) (citation omitted). To establish the third, prejudice prong, the petitioner must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's ineffectiveness. Dennis, supra at 954. We stress that boilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective.

Commonwealth v. Paddy, 15 A.3d 431, 442–43 (Pa. 2011)

Stated more simply, when alleging ineffective assistance of counsel, a petitioner must demonstrate that counsel's performance was deficient and that the petitioner was prejudiced by that deficient performance. Commonwealth v. Pierce, 527 A.2d 973, 975 (Pa. 1987). If counsel's actions had some reasonable basis for effectuating the client's interests, then they are deemed constitutionally effective and counsel's performance cannot be found to have been deficient. Id. An evaluation of the various claims in this matter reveals that the underlying claims are speculative

and therefore meritless, Petitioner's counsel had reasonable bases for their actions, and Petitioner cannot demonstrate that he was prejudiced.

As noted above, Petitioner claims that he was prejudiced by his counsels' failure to help him present various excuses for his conduct which he suggests would have resulted in the imposition of a more lenient sentencing scheme. His claims, however, are only based upon improbable speculation as to what this Court might have done, and he fails to acknowledge that: (1) under the circumstances of this case, he could have faced a much more serious charge of third degree murder, (see N.T. 6/8/17, pp. 26, 50, 133); and (2) after his guilty plea to the three charges under counts one, two and four, he was actually sentenced within the standard range of the Pennsylvania Sentencing Guidelines for the most serious charges of involuntary manslaughter and possessing the high powered rifle, and *below* the mitigated range of the sentencing guidelines for the charge of possessing the shotgun. Nevertheless, Petitioner now suggests that despite his guilty plea and professed intention to accept full responsibility for the death of Barry Groh, he should not have been held responsible for his flagrant actions before and after the victim's death.

It is widely recognized that "a sentencing judge is given a great deal of discretion in the determination of a sentence," and that a "sentencing court has broad discretion in choosing the range of permissible confinements which best suits a particular defendant and the circumstances surrounding his crime." Commonwealth v. Boyer, 856 A.2d 149, 153 (Pa.Super. 2004), *aff'd*, 891 A.2d 1265 (Pa. 2006) (internal citations omitted). Overall, we did not find Manilla's proffered reasons and excuses for his pre and post shooting conduct to be credible, and upon consideration of the totality of the circumstances of this case and the logical inferences therefrom, we determined that the sentences imposed were both fair and appropriate. We will, however, address each of Manilla's claims seriatim as follows:

**(1) Court illegally took into account his prior decision to plead not guilty and go to trial for a prior game law violation**

After the PCRA hearing on June 19, 2017, Petitioner and his retained counsel withdrew this first issue initially raised in his Second Motion to Amend PCRA Petition alleging that "this Court illegally took into account his prior decision to plead not guilty and go to trial for a prior game law violation, thereby punishing him for exercising his right to go to trial in that matter." (*See* N.T. 6/19/17, p. 97.) Therefore, relief may not be granted on this issue and it will not be considered.

**(6) Failure to provide letters of reference at sentencing to mitigate the sentence**

Petitioner failed to raise at the two PCRA hearings the sixth issue in which he alleged ineffective assistance of counsel for failure "to seek letters of reference to present to the Court at sentencing to mitigate the sentence," and therefore this issue has been waived.

We hasten to add, however, that this issue is meritless because, contrary to Petitioner's allegation, his sentencing counsel did in fact present approximately twenty-five character reference letters and two (2) expert reports to this Court prior to Petitioner's sentencing on July 8, 2011. (*See, e.g.*, N.T. 6/8/18, p. 129; N.T. 7/8/11, p. 68.) Furthermore, this Court read every one of those letters and reports and was well aware of that mitigating evidence prior to Petitioner's sentencing.

**(2) Failure to challenge inference drawn from presence of mud in rifle**

The first substantive issue that Petitioner has raised in his request for post-conviction relief is a claim that his sentencing counsel was ineffective for failing to challenge "the implications the Court could draw from the presence of dirt in one of the firearms by having him explain he was not responsible for the condition of the firearm." This issue relates to the presence of a "plug" of mud that was subsequently discovered in the barrel of the rifle after it had been used in the shooting death of the victim. As we noted in our prior Opinion above, "a forensic comparison of the bullet

retrieved from Groh's body to the .30-06 rifle used by Defendant was impossible, however, because the bore of the rifle had been plugged with approximately a half inch of mud." This prevented a ballistic analysis and definitive match of the rifle to the bullet that killed the victim.

Petitioner alleges that this Court improperly inferred that he intentionally destroyed evidence in an effort to hinder the discovery of his involvement in the shooting by subjecting the barrel of the rifle to mud and moisture thereby preventing an accurate ballistic analysis. Petitioner insists that he was not responsible for the introduction of mud into the rifle barrel, and suggests that if his sentencing counsel had successfully challenged that inference, the result would have been a more lenient sentence.

This Court, however, does not find Petitioner credible. Despite his proclamation throughout the hearings that he accepted "full accountability and vulnerability for everything" in the shooting death of the victim Barry Groh, Petitioner has attempted to convince this Court that one of his farm workers, James Stewart, who he claims "wasn't the most intellectual people [sic]," was instead responsible for inadvertently plugging the rifle barrel with mud after the killing. Although Petitioner insisted during the PCRA hearing on June 19, 2017, that he was unable to recall the recitation of facts at his guilty plea because his "cognitive ability was somewhat challenged at the time," Petitioner was nevertheless able to conveniently and clearly recall that Stewart "put the entire weight of the gun, the barrel onto the dirt or the mud," and he even claimed that Stewart was "leaning on the firearm" and "[i]t appeared to me that it was both times he was leaning forward and reaching." (See N.T. 6/19/17, pp. 32-40; see also N.T. 6/8/17, p. 182.)

We also noted, however, that during the initial investigation of the shooting, Petitioner had provided a statement to the investigating detectives on December 4, 2010 that he had not dropped the rifle and the rifle had not been out of his possession from the time of the shooting until he

surrendered it to them on that same date. When he was asked at the PCRA hearing to explain the discrepancy between that statement and his current claim that James Stewart was responsible for the plugged rifle barrel, Petitioner stated "**I changed the story**" (emphasis supplied). We further noted that Petitioner could not explain Stewart's contradictory sworn testimony before the investigating Bucks County Grand Jury that he had not been responsible for the rifle's condition. (*See* N.T. 6/19/17, pp. 33-39.)

Petitioner has tried to deflect responsibility for the destruction of ballistic evidence, in what was clearly an intentional effort to disguise his involvement in the shooting death of Barry Groh, by presenting an explanation that this Court found completely incredible. (*See, e.g.,* Commonwealth v. Spotz, 84 A.3d 294, 313 (Pa. 2014) (credibility determination was within the PCRA court's fact-finding authority and is entitled to great deference).)

Furthermore, Petitioner's claim that he was prejudiced by the failure to challenge the inference of intentional spoliation of evidence is based upon improbable speculation that he would have been sentenced more leniently if this Court had determined he was not responsible. A more lenient sentence however, was highly unlikely given the facts and circumstances of this case and our determination that an appropriate sentence had already been imposed for the charges to which Petitioner had pleaded guilty. In this instance, Petitioner has claimed ineffective assistance of counsel for failing to present a dubious if not completely incredible explanation to the Court. We believe, therefore, that this issue is meritless as is Petitioner's ineffective assistance claim.

### (3) Failure to explain transfer of Petitioner's property to his mother after the shooting

Petitioner alleges that his counsel was ineffective for failing "to recommend and help Petitioner explain the transfer of his property to his mother, which was not done at his instigation or with his participation." Petitioner suggests that this Court derived a similar unfavorable

inference of unrepentant behavior as a result of the transfer of his property to his mother after killing the victim, in an apparent effort to protect his assets from any civil proceedings that might be initiated against him as a result of that killing.

Petitioner claims that counsel provided ineffective assistance by failing to have Petitioner explain to the Court why and how his properties were transferred, which would have allegedly overcome the unfavorable inference derived from his actions. According to Petitioner, his mother purportedly transferred the properties without his knowledge or approval and therefore this Court should not have inferred any nefarious intent on his part. Once again, Petitioner's ineffective assistance of counsel claim is premised upon an unbelievable explanation and improbable speculation that he may have received a more lenient sentence, and it therefore lacks any merit.

This Court was aware that Petitioner admitted at his sentencing hearing on July 8, 2011, that "I took actions with respect to my properties of transferring them out of my name," (*see* N.T. 6/8/17, pp. 73-74 (*referencing* N.T. 7/8/11, p. 71)), and that his mother testified at the PCRA hearing on June 8, 2017, that "[w]hat I was trying to accomplish was knowing that we worked so hard for what we achieved, I was trying to protect my son and help him." (*See* N.T. 6/8/17, p. 66.) Both Petitioner and his mother were obviously aware that their actions were wrong and conducted with improper motive. Furthermore, it is evident that Petitioner, who was a licensed attorney in the Commonwealth of Pennsylvania, must have been or should have been aware that his properties could not be transferred without his authorization, approval and **signature** (emphasis supplied).

As noted above, we rejected Petitioner's suggestion that his improper actions were the result of his impaired cognitive abilities, and we also reject his latest explanation that he was suffering severe emotional distress and merely following his mother's instructions when he transferred title to his properties to her in an obvious effort to protect them from seizure.

Petitioner's mother's testimony that she was trying to help her son by unilaterally preparing the necessary documents because he was "unfit mentally," and that Petitioner was a dutiful son who did what she told him to do, (see N.T. 6/8/17, pp. 63-65), reveals an awareness that her actions involved fraudulent conveyances of title. We cannot countenance such fraudulent conduct and therefore reject Petitioner's "explanation" and find his ineffective assistance of counsel claim in this instance meritless.

We note parenthetically that Petitioner had the opportunity to explain his actions to this Court during his allocution at his sentencing on July 8, 2011. Instead, and in complete contradiction of his professed desire to accept full responsibility for the death of Barry Groh, Petitioner has attempted to deflect that responsibility by casting blame upon his sentencing counsel for his inability to convince this Court of his allegedly innocent conduct with an improbable explanation. We believe this issue to be meritless and Petitioner is not entitled to relief.

### (4) Failure to explain why he did not contact emergency services immediately after shooting the victim

Petitioner next asserts that his counsel was ineffective for failing to recommend and help him explain to this Court why he failed to contact emergency services immediately after the shooting. Petitioner suggests that he could have provided an explanation that would have dispelled the obvious unfavorable inference derived from that conduct, and which he again asserts would have resulted in the imposition of a more lenient sentence.

Despite the fact that Petitioner shot and killed the victim shortly after 11:00 a.m., and then returned to his farm clubhouse and attempted to hide his rifle and did not call 911 or emergency services until over an hour later at 12:39 p.m.; and despite the fact that Petitioner and his hunting companions did not advise the emergency medical responder who subsequently arrived at the scene that the victim had been shot; and despite his insistence throughout the hearings that he

accepted full responsibility for his actions, Petitioner again contends that he is entitled to PCRA relief because his counsel was ineffective for failing to present to the Court a specious explanation for his failure to act.

The facts and circumstances surrounding the death of Barry Groh are incontrovertible. Petitioner and his companions were deer hunting on November 29, 2010, when they encountered a neighbor, Brian Schrier, and his two daughters around 11:00 a.m. When Schrier observed Petitioner carrying a high powered rifle which he was pointing in Schrier's direction, he asked Petitioner why he was hunting with an impermissible weapon. Petitioner responded he was looking to dispatch a previously wounded deer. After Petitioner walked away from his encounter with Schrier, he inexplicably fired a shot in the direction of Schrier and his daughters. Shortly thereafter, Petitioner fired another shot which killed Barry Groh after Groh had shot a large buck on the neighboring property. Petitioner and his companions then failed to immediately contact emergency personnel, despite having at least two cell phones, and when emergency personnel eventually arrived over an hour later, Petitioner did not advise them that Groh had been shot, even when the emergency personnel expressed belief that Groh had experienced a heart attack. Petitioner then took numerous and substantial steps to conceal the killing, including attempts to find, retrieve and presumably hide the shell casing from the bullet that killed Groh, and efforts to relocate and hide not only Petitioner's high powered rifle used to kill Groh, but approximately 98 other firearms that Petitioner was prohibited from possessing.

Petitioner then attempted, after the shooting of Mr. Groh, to transfer many of those weapons to his girlfriend, Barbara Fletcher, in an obvious effort to conceal his illegal ownership of them. In fact, it was revealed that due to a prior felony conviction, Petitioner was prohibited

from purchasing and possessing any firearms, yet he used Barbara Fletcher as a straw buyer to purchase those weapons. (*See* N.T. 6/8/17, pp. 161-164; N.T. 6/19/17, pp. 88-89.)

Investigation further revealed that after Petitioner had killed Mr. Groh, the buck that Groh had shot was subsequently pulled onto Petitioner's property from a property on the opposite side of the creek which was not owned by Petitioner. As previously noted, Petitioner also took additional and substantial steps to transfer title to his real estate to his mother in an effort to protect his assets. These actions do not reflect the conduct of an individual who alleges he negligently and remorsefully shot and killed the victim and suffered consequential emotional distress, but of someone who in a cold and calculating manner was trying to conceal all evidence of his criminal and illegal conduct.

In the explanation he provided at his guilty plea for the delay in reporting the shooting of Barry Groh, Petitioner alleged that he did not have a cell phone with him. He further and incredulously claimed that his companions, who included the former District Attorney of Montgomery County, Mike Marino, did not permit him to use their cell phones or call emergency service because they "didn't want to get involved." (*See, e.g.,* N.T. 6/8/17, pp. 154-155; N.T. 6/19/17, p. 43.) Even if this Court considered that explanation to be credible, and Petitioner and his companions were not actively engaged in attempting to cover up the circumstances behind Groh's death, that explanation describes egregious and horrific conduct which cannot be excused. We further note that despite the evidence that the buck that Groh had shot had been dragged onto Petitioner's property from the location where it had originally been killed, presumably in a calculated effort to create a plausible excuse for why Petitioner fired at Groh, Petitioner had the audacity to attempt to shift the blame to the victim by suggesting during his allocution that the victim was not permitted to legally hunt in that area in the first place. (*See* N.T. 7/8/11, p. 68, 74.)

The record is completely devoid of any evidence that would convince this Court that Appellant attempted to immediately contact emergency services after shooting Mr. Groh. The believable facts reveal instead that, rather than immediately contact the authorities, Petitioner proceeded to his clubhouse where he attempted to hide his rifle and then took steps to conceal his substantial collection of firearms. Despite Petitioner's assertions to the contrary, it was apparent that steps were taken to destroy the ballistics evidence by plugging the rifle barrel with mud, and that Petitioner even fired one of his shotguns into the ground in an attempt to create another plausible explanation in which he was going to claim to the game warden that he had actually fired a shotgun and not the Remington 760 pump action .30-06 rifle. (*See* N.T. 6/19/17, pp. 40-41, 59.)

Furthermore, we completely rejected as self-serving and incredible Petitioner's claim that, rather than creating a believable alternative explanation for his actions, he instead picked up the shotgun with the intention of killing himself, and that as a result he was subsequently "302'd" two days later. (*See* N.T. 6/8/17, pp. 156-157.) Petitioner's claim that he put one round in the chamber of the shotgun but was too nervous to "unload" it and therefore just "fired a shot" into the ground, was completely devoid of any credibility, and contrasts with the initial statements he provided to the investigating detectives to whom he now claims he **lied** (emphasis supplied). (*See* N.T. 6/19/17, pp. 40, 57-59.) Petitioner's actions in seeking assistance from his companions as well as directing his farm employees to find the shell casing from the bullet that killed Groh and help hide his voluminous collection of firearms that he was prohibited from owning, his attempt to hide those weapons at his girlfriend's house, and his efforts to transfer title to his properties to his mother belie his alleged intent to commit suicide. Instead, it was obvious to this Court that Petitioner's entire course of conduct was calculated to cover up all traces not only of his illegal possession of

firearms but his responsibility for shooting and killing Barry Groh in a clear effort to "save his skin."

This Court was further aware that Petitioner had incredibly claimed, in an early morning argumentative encounter with his neighbor, Brian Schrier, that he possessed the high powered .30-06 rifle for the purpose of pursuing and dispatching a wounded deer that had been shot earlier. Despite subsequently firing a shot in the direction of Schrier and his daughters after that encounter, Petitioner further incredulously claimed that he had granted permission to Schrier to hunt on his property the following Saturday. (*See* N.T. 6/8/17, p. 161; N.T. 6/19/17, p. 64.) If Petitioner's explanation that he intended to dispatch a wounded deer was to be believed, then Petitioner would have had no reason to fire his high powered rifle at an object that the investigating detectives had determined was 88 yards away, or fire his rifle at an alleged deer that detectives determined would not have been visible to Petitioner at the location from which he fired.

Petitioner's claim of ineffective assistance of counsel in this instance is based upon an alleged failure to present an explanation to this Court which we determined to be deceptive, entirely incredible and designed simply to shift blame and responsibility away from Petitioner. The facts speak for themselves. We find no merit to this claim and his ineffective assistance claim should be denied.

### (5) Failure to allow the Court and the Commonwealth to ask him questions rather than recommending he allocute

The final issue upon which Petitioner seeks relief is a claim that his counsel was ineffective for failing to "allow the Court and the Commonwealth to ask him questions, rather than recommending that he allocute so he could answer the allegations the Court and the Commonwealth raised that he continued to conceal evidence of the shooting and otherwise did not act in a responsible and remorseful way." Petitioner suggests that, instead of recommending that

he allocute at his sentencing hearing, his counsel should have arranged for Petitioner's examination by the Court and the Commonwealth in order to "open myself up to complete vulnerability" and compensate for Petitioner's inability to successfully convince this Court that he had no improper motives for the actions he undertook after he killed Barry Groh. (*See* N.T. 6/19/17, p. 17.)

This claim is not only meritless, because no such right or procedure for examination of a defendant during allocution exists, but it is particularly preposterous in light of the fact that Petitioner had been a licensed attorney in the Commonwealth of Pennsylvania for nineteen (19) years, and who should therefore have known that no such right of examination during allocution exists.

At his sentencing on July 8, 2011, Petitioner was provided, pursuant to Pa.R.Crim.P. 1405, the opportunity to make a statement in his own behalf, and at that time he had every opportunity to provide his explanations for his conduct without fear of being cross-examined or challenged by this Court or the Commonwealth. (*See* N.T. 6/19/17, pp. 60-61.) After apparently recognizing that the explanations he offered during his allocution at his sentencing were not credible, Petitioner now claims that his counsel was ineffective for failing to procure his direct and cross-examination by this Court and the Commonwealth during that allocution. His claim fails for several reasons.

As noted above, Petitioner was provided with an opportunity to present a statement on his own behalf in order to explain his conduct, and he was freed from any challenges or cross examination that would potentially, and in this case most likely, impeach his statements and confirm his dishonesty and deceitfulness. As a result, Petitioner cannot demonstrate any prejudice resulting from his decision to allocute.

Furthermore, despite being a licensed attorney in the Commonwealth of Pennsylvania, Petitioner demonstrated his complete ignorance of the concept of allocution when he was asked

by this Court what "it meant to allocute before a judge." Petitioner's response that "I was under the impression, Your Honor, to open up for direct and cross examination by the court was my interpretation of the allocution [sic]," was, as we observed, "just about 100 percent incorrect." (*See* N.T. 6/19/17, p. 94.) Petitioner's claim is therefore inappropriately based upon a misconception and misunderstanding of allocution.

Next, both of Petitioner's counsel credibly testified that while they advised him to allocute, the ultimate decision to do so was strictly made by him, and that Petitioner was in fact "involved in every step of the representation [and] ultimately, every decision was his." (*See* N.T. 6/8/17, pp. 27, 104.) Furthermore, despite his assertions to the contrary, we did not find a shred of credibility in Petitioner's self-serving testimony in which he attempted to convince this Court that he had been coerced by his counsel into allocuting. (*See* N.T. 6/19/17, pp. 80, 180.) We further noted that despite all of his testimony to the contrary, Petitioner reluctantly admitted that the decision to allocute was his. (*See* N.T. 6/8/17, p. 179.)

Petitioner's counsel also testified throughout these hearings that, upon consideration of the potential federal charges Petitioner faced as the result of the discovery of his illegal possession of a vast and extensive collection of firearms, Petitioner's decision to allocute was a reasonable one. Both of Petitioner's counsel expressed concern that any information or testimony elicited from Petitioner regarding his possession of those firearms would jeopardize his federal case, and as one of his attorneys stated, "I wasn't going to subject him to cross-examination when he had a federal open investigation." (*See* N.T. 6/8/17, pp. 31, 56, 95, 106-107.) Upon recognition of the well-established principle that counsel cannot be ineffective if it is determined that counsel's actions had some reasonable basis for effectuating the client's interests, it is clear that Petitioner's counsel

had a very sound basis for advising Petitioner to allocute rather than undergo direct and cross examination during his sentencing.

Clearly there is no right or option for a defendant to be questioned or examined and cross-examined during allocution. In addition, it is not only clear that the decision to allocute was Petitioner's, but that Petitioner's counsel had a reasonable basis for advising Petitioner not submit to examination as that could jeopardize his defense to potential federal firearms charges. Petitioner's allegations are therefore meritless and his ineffective assistance of counsel claim in this instance should also be denied.

## VI. CONCLUSION

This Court finds that the ineffective assistance of counsel claims underlying Petitioner's request for relief in his amended PCRA petition are speculative and meritless. Petitioner's counsel had reasonable bases for their actions, and Petitioner cannot demonstrate that he was prejudiced. Therefore, Petitioner's requests for relief pursuant to the PCRA are denied and we enter the following Order:

Copies Sent To:


**Stuart Wilder, Esquire**
PRATT, BRETT & LUCE, P.C.
68 East Court Street
P.O. Box 659
Doylestown, PA 18901

                *Attorney for Petitioner*    DAVID M. MANILLA


**Robert D. James, Esquire**
Deputy District Attorney
Office of the District Attorney
Bucks County Justice Center
100 N. Main Street
Doylestown, PA 18901

                *Attorney for the Commonwealth*

# IN THE COURT OF COMMON PLEAS
## BUCKS COUNTY, PENNSYLVANIA
### CRIMINAL DIVISION

|  |  |  |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | No. CP-09-CR-0000790-2011 |
|  | : |  |
| v. | : | POST-CONVICTION |
|  | : | RELIEF ACT |
| DAVID M. MANILLA | : |  |

## ORDER

AND NOW, this 18th day of **May, 2018**, upon consideration of:

1. The Post-Conviction Relief Act ("PCRA") Petition filed by Petitioner David M. Manilla on April 25, 2014;

2. The "Second Motion to Amend Defendant's PCRA Petition" filed by Petitioner on May 31, 2017;

3. The evidence submitted at the hearings held on June 8 and 19, 2017 on the merits of Petitioner's PCRA claims; and

4. A total and complete review of Petitioner's record;

It is hereby ORDERED and DECREED that Petitioner's PCRA Petition filed on April 25, 2014 and Amended on May 31, 2017 is hereby DENIED and DISMISSED.

Petitioner shall have thirty (30) days from the date of this Order to file an Appeal to the Superior Court of Pennsylvania from this Order.

BY THE COURT:

Albert J. Cepparulo, S.J.